UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Dixie A. Wilczynski, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 17 CV 50095 |
| | ) | Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This is a disability benefits appeal. After working for nearly 40 years, plaintiff Dixie A. Wilczynski was fired from her job in 2009 because she took too much time off to go to the doctor to treat arthritis in her hands. That same year, she was diagnosed with lupus. She had already been experiencing back pain for several years. In 2011, she began having recurrent episodes of vaginal pain and spasms.[1]

In October 2011, she began treatment with Dr. Terri Dallas-Prunskis at the Illinois Pain Institute. This treatment was extensive, involving over 21 "operative procedures" over a two-plus year period. Dkt. #15 at 2. These included facet injections, genito-femoral nerve blocks, sacral nerve blocks, and several pain medications. R. 20-21. As summarized by plaintiff, in 2013, "on 24 days [she] had 8 operations to reduce pain, 13 doctors' visits, and 3 days when medical tests were performed." *Id.* at 9 (citations omitted). Then, in the first part of 2014, these treatments stopped because her insurance changed. R. 22.

---

[1] This account is largely based on plaintiff's testimony.

1

In October 2015, at an administrative hearing, plaintiff testified that her pain was the same or worse as it was when she began treatment. She stated that she had good days and bad days, and on the bad days, she sat in a recliner most of the day. Dr. Gilberto Munoz testified as the medical expert. His testimony was relatively short, with little discussion of specific evidence. He first concluded that the objective evidence, including several MRIs, established that plaintiff's degenerative disc disease and a history of pelvic pain were severe impairments. However, he opined that plaintiff was not disabled because her treatments with Dr. Dallas-Prunskis had "helped." R. 58. When asked what this conclusion was based on, he stated that "there was no surgical recommendation." *Id.*

On November 30, 2015, the ALJ found that plaintiff could do her past relevant work as an accounts receivable clerk and a medical receptionist. The ALJ offered three main rationales for finding plaintiff's pain allegations to be not credible: (1) her treatment was effective; (2) she did certain activities such as exercising daily; and 3) the objective evidence was mild.

In this appeal, plaintiff, who is now 66 years old, raises several arguments for a remand, some stronger than others. Rather than address them one by one, the Court finds it more helpful to organize the discussion around the ALJ's three rationales. As explained below, each one suffers from at least one infirmity, and these infirmities collectively warrant a remand.

**Rationale #1—Treatment Was Effective.** If there is a fork in the road in the parties' view of this case, it is over the issue of why plaintiff stopped treatment in 2014. The ALJ and Dr. Munoz agreed that plaintiff underwent a "significant" course of treatment at the pain clinic, but they concluded that this treatment had been "generally effective to control pain." R. 19; *see also* R. 23 ("improvement with treatment"). This theory rests on the assumption that the treatment ended essentially because it was successful. The ALJ noted that plaintiff did not have spinal

2

surgery or go to the emergency room after stopping treatment. The ALJ also pointed to several statements plaintiff made that certain procedures were effective. Plaintiff offers a starkly different picture. She argues that she stopped treatment merely because of insurance problems, and argues that the "sheer volume of 21 operations" shows the "intractability" of her problems. Dkt. #15 at 7.

After considering these arguments, the Court finds that the ALJ's theory relies too much on strained inferences without any firm evidentiary foundation. This is true for several reasons. First, the ALJ relied on the fact that plaintiff did not have spinal surgery. R. 23 ("She had an extensive history of interventions, but did not have spinal surgery."). However, for this fact to have weight, it is important to establish that there was some surgery available that had a reasonable chance of addressing the pain. *See, e.g., Freund v. Berryhill*, 2018 WL 3008634, *5(N.D. Ill. June 15, 2018) ("The unproven premise in the ALJ's argument is that there was some surgery available that would correct the problem. Neither Dr. Slodki, nor the ALJ, identified any viable option."). So too here. Neither Dr. Munoz nor the ALJ identified a particular surgery that had a reasonable chance of working. The ALJ briefly noted earlier in the narrative portion of the decision that plaintiff had a spinal consultation with Dr. Babak Lami in June 2014, and that Dr. Lami had "offered a fusion surgery." R. 22. But this one reference is not sufficient because Dr. Lami opined that her pelvic pain "was unrelated to her spine"; therefore, it is not clear that this surgery would have helped that pain, which is the primary one plaintiff complained about. *Id.*

Second, the ALJ noted that plaintiff did not go to the emergency room after stopping treatment. However, as the Seventh Circuit has explained, this is a weak basis for finding that a claimant was not experiencing significant pain. *See Schomas v. Colvin*, 732 F.3ed 702, 709 (7th

3

Cir. 2013) ("a person suffering continuous pain might seek unscheduled treatment if that pain unpredictably spikes to a level which is intolerable, but otherwise why would an emergency-room visit be sensible? Unless emergency treatment can be expected to result in *relief*, unscheduled treatment in fact makes no sense") (emphasis in original).

Third, the ALJ's theory offers no response to the most obvious explanation for why plaintiff stopped treatment, which was the problem with her insurance. The ALJ did not challenge the accuracy of this assertion. And the ALJ even stated in the decision that plaintiff "abruptly" stopped treatment. R. 23. This description does not fit with a natural winding down of a successful course of treatment. Relatedly and importantly, the ALJ did not point to any contemporaneous statement from Dr. Dallas-Prunskis suggesting that she believed that plaintiff no longer needed treatment. In sum, plaintiff's insurance explanation is the simpler one. The ALJ's contrary theory—that plaintiff was essentially cured at the end of the long, but mostly unsuccessful, treatment period—is speculative. This brings to mind the aphorism sometimes told to medical interns who are prone to reach for rare, exotic diagnoses—"when you hear hoofbeats, think of horses not zebras."

Fourth, the ALJ claimed that plaintiff admitted that the treatments worked. *See, e.g.,* R. 20 (in October 2011, after undergoing a genito-femoral nerve block, plaintiff "reported she was feeling better"); R. 20-21 (in November 2011, after a second such procedure, plaintiff "reported that the pain was not constant but intermittent and that when it did occur, it did not last long"); R. 21 (in February 2013, after radiofrequency lesioning, plaintiff reported that she "was feeling much better"). But these statements are undermined by plaintiff's later statements that the benefits were only temporary. *See id.* ("However, the relief was not long-term according to the claimant"); *id.* ("reported the pain relief was temporary"). Plaintiff's assertion that the

4

improvement was only temporary is bolstered by the fact that she continued to receive many more treatments after making these statements. If the plaintiff's pain returned each time to previous levels, it is difficult to reasonably characterize the treatment as "effective".

There was one piece of evidence described in the decision that perhaps supports the ALJ's theory of permanent improvement. In December 2014, eight months after stopping treatment, plaintiff returned for a visit with Dr. Dallas-Prunskis. It is not clear how she was able to return given her insurance problems. In any event, the ALJ pulled out and relied on several comments from the notes of this visit. The ALJ noted that plaintiff was "was working out daily and "seemed to be doing well" and "had episodes of vaginal pain but nothing long term like she had some time ago." R. 22-23. On their face, these statements appear to support the ALJ's theory. However, when viewed context, they turn out to be the result of classic and impermissible cherrypicking. Here is a longer quotation:

> Subjective: Dixie Wilczynski comes to the office today for a follow-up visit. She was last seen on April 10, 2014, where she had refills of her tramadol. She describes her pain today on a scale of 0 to 10 as a 4 and states it is still in the vaginal area, stabbing, *and the same*. Sitting and resting make it better. Too much activity makes it worse. Social history and family history are unchanged. Review of systems: She is still dieting, working out on a daily basis, and seems to be doing well.
>
> \* \* \*
>
> Assessment: Vaginal pain, *unresolved but stable.*
>
> Plan: 1. Refill patient's tramadol 50 mg, #90, one q.8h. p.r.n. pain with three refills equals four months. 2. I also discussed with Dixie a suppository for the vaginal area that might be helpful. A prescription was written for gabapentin 6%, Lidocaine 3%, and baclofen 2% in a Versa base, 120 gm. She will apply that to the affected area two to three times per day.

R. 627 (emphasis added). As this passage demonstrates, plaintiff was *not* reporting that her problems had improved but instead told the doctor that they were the "same." The ALJ omitted

5

these facts. The ALJ also ignored Dr. Dallas-Prunskis's treatment recommendations, which continued with the same pain medications and even offered new options. These recommendations do not suggest that the doctor believed the earlier treatment was successful. In sum, the ALJ's primary rationale is unsubstantiated based on the current record.

**Rationale #2—Inconsistent Activities.** The ALJ found that plaintiff's testimony was contradicted by certain activities she engaged in. Here is the main explanation:

> While the nature and frequency of her treatment for these impairments shows they were clearly severe, the severity of these and the extreme limitations she reports are not supported by the evidence overall. She had taken out-of-state trips. She had apparently had pain or pain that began after walking half a mile or after she reportedly did very fast walking with a friend. She reportedly had intermittent pain mostly and was able to walk on a treadmill for an hour a day. All these are inconsistent with severe and constant pain levels that she alleges she had.

R. 23. In addition to the above activities, the ALJ also noted that plaintiff was in "no obvious pain" during the hearing and gave "spontaneous" answers without losing "focus or concentration. R. 20; *see also* R. 23 ("the claimant was articulate and descriptive at the hearing for well over an hour[2] with no indication that she had severe chronic pain."). The ALJ also faulted plaintiff for not keeping a pain journal as advised by Dr. Dallas-Prunskis. The ALJ concluded that plaintiff's testimony was "grossly inconsistent" with these activities. R. 25. The Government calls them "blatant" contradictions. Dkt. # 20 at 1.

After reviewing the record, the Court finds that the alleged inconsistencies are much less clear than portrayed by the ALJ. The Court begins with the key finding undergirding this rationale. It is the ALJ's characterization of plaintiff's pain testimony. According to the ALJ, plaintiff claimed at the hearing that her pain was "*constantly* severe." R. 25; R. 23 ("All of these are inconsistent with *severe and constant* pain levels that she alleges she had.") (emphases

---

[2] The transcript indicates that the hearing lasted 39 minutes. *See* R. 33, 70. Perhaps the ALJ was including additional time plaintiff spent while waiting for the hearing to start.

added). The ALJ basically suggested that plaintiff exaggerated her pain by unrealistically claiming that she was in unremitting, severe pain 24 hours a day, 7 days a week. This characterization, if accurate, effectively sets up a credibility tripwire that can be easily triggered by almost any activity or physical exertion, no matter how infrequent, minor, or innocuous.

Given this fact, it is important to make sure that the ALJ's characterization was fair and complete. Put differently, did the ALJ create what amounts to a 24-7 pain strawman? After reading the transcript, the Court finds that the ALJ failed to give sufficient weight to plaintiff's statements that her pain was episodic rather than constant. Throughout her testimony, plaintiff emphasized that she had both good days, when she could do various activities, and bad days, when she stayed all day in a recliner. *See* R. 38, 39, 48. She estimated that she had three bad days a week, and that she had vaginal spasms every couple of days, each spasm lasting one to two hours. R. 39, 44. These statements do not support the characterization of constant pain.

In the early part of the decision, the ALJ summarized some of this testimony. However, in the later analysis, the ALJ excluded these details and, as stated above, suggested that plaintiff was claiming that her pain was "constantly severe." This difference in characterization is crtical because it sets the baseline for what type of activity is considered inconsistent.

Consider, for example, the ALJ's observation that plaintiff showed no pain during the hearing. This would not be inconsistent if plaintiff had a good day on the day of the hearing. However, the ALJ never asked her this question at the hearing. Similarly the fact that plaintiff, on two occasions over a multi-year period, went for a fast walk with a friend would not necessarily be inconsistent.

The two strongest activities supporting the ALJ's rationale are plaintiff's daily exercising and her long trips down south. These activities are legitimate areas of inquiry, and may be

7

considered on remand. *See, e.g.*, *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015) (ALJ could properly discount the claimant's allegations about severe headaches based on her taking a 20-hour flight to and from Australia, running daily for an hour, and running in a 5,000-meter race). In particular, the statement that plaintiff was exercising "daily" for an hour does appear to be at odds with her hearing testimony that she stayed in the recliner for the entire day three days a week. But even with these two activities, the ALJ should develop the factual record more to make clear the nature of the supposed inconsistency. It is unclear whether plaintiff's exercising stopped when her problems worsened. The Government's brief stated that she did this daily exercise "for several months." Dkt. #20 at 1. As for the trips, plaintiff reasonably complains that the ALJ gave no weight to her statements that she was "miserable" and in a "great deal of discomfort" after taking one of the trips, a fact she reported to Dr. Dallas-Prunskis after returning. R. 22.

Finally, the criticism that plaintiff did not keep a pain journal rests on speculation. The ALJ observed that Dr. Dallas Prunskis asked plaintiff to "keep a journal of her pain relief" after the genito-femoral nerve block in October 2011. R. 20. The ALJ faulted plaintiff for not complying with this request, and suggested that the failure to do so demonstrated that her pain was not serious. But there is no evidence that plaintiff failed to keep a journal. The ALJ did not cite to any statement from Dr. Dallas-Prunskis to support this assertion. The ALJ skirted around this evidentiary gap by blaming plaintiff for not having produced a journal. *See* R. 18 ("there is no evidence in the record she ever kept a journal"). But this negative inference is unfair because the ALJ never asked plaintiff about this issue at the hearing. As a result, plaintiff was not offered the opportunity to produce the journal, if she had one, or to provide an explanation.

For the above reasons, the ALJ's explanation for discounting of plaintiff's testimony based on these activities is erroneous.

**Rationale #3—Mild Objective Evidence.** As the parties are well aware, this is a gray area. ALJs are permitted to rely on the lack of objective evidence as *one* factor in the credibility determination but may not rely on it as the *sole* reason nor use it as a litmus test. *See Hall v. Colvin*, 778 F.3d 688, 691 (7th Cir. 2015) ("an administrative law judge may not deny benefits on the sole ground that there is no diagnostic evidence of pain"); *Adaire v. Colvin*, 778 F.3d 685, (7th Cir. 2015) ("[The ALJ's] principal error, which alone would compel reversal, was the recurrent error made by the Social Security Administration's administrative law judges, and noted in many of our cases, of discounting pain testimony that can't be attributed to 'objective' injuries or illnesses—the kind of injuries and illnesses revealed by x-rays."). Here, the ALJ made several statements that arguably cross this admittedly fuzzy line. *See* R. 23 ("The undersigned was not persuaded by the claimant's hearing testimony that she has work-preclusive pain levels despite treatment, as there is *no* objective support for these extreme limitations in the record."); *id.* ("There is not *sufficient* objective support for the consistency, frequency, or the symptom level that she alleges she had.") (emphases added). However, given this Court's decision to remand based on the above two rationales, the Court will not further analyze this issue. On remand, the ALJ should be cognizant of this issue and should not impose, either directly or indirectly, a requirement that all plaintiff's subjective allegations be verified by objective evidence.

In conclusion, the Court notes that plaintiff raised a few other arguments, including ones related to her anxiety and obesity; however, the Court found these arguments less developed and not persuasive. The Court need not address them further given the decision to remand based on

9

the above arguments. Plaintiff's counsel can raise these issues directly with the ALJ on remand to ensure that they are fully considered.

Plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: November 16, 2018　　　　　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　Iain D. Johnston
　　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge